UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE )
COMMISSION, )
       Plaintiff, )
  )
v. )   **Civil Action No. 00-CIV-11141-JLT**
  )
SG LIMITED )
d/b/a STOCKGENERATION, )
       Defendants. )
and )
  )
SG PERFECT LIMITED and SG )
TRADING LIMITED )
  )
       Relief Defendants )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO MODIFY ASSET FREEZE ORDER

### I.    INTRODUCTION

The Defendant SG Limited d/b/a STOCKGENERATION and the Relief Defendants SG Perfect Limited and SG Trading Limited (referred to throughout this Memorandum collectively as "SG") submit this Memorandum of Law in support of their Motion to Modify Asset Freeze Order to permit the release of $250,000.00 for the purpose of paying attorney's fees and related expenses.

### II.    BACKGROUND

On June 9, 2000 the SEC filed its complaint and *Ex Parte* Motion for a Temporary Restraining Order against SG. In the *Ex Parte* Motion, the SEC sought to

restrain SG's funds in several banks, including a bank in Estonia. The court (Saris, J.) issued a wide-ranging Temporary Restraining order freezing approximately $6.5 million in SG's assets and subjecting SG to immediate discovery obligations.[1] Ultimately the court, (Tauro, J.) granted the SEC's request for a Restraining Order. The freeze order was so broad that SG was even prevented from using its own funds to retain compensated counsel to defend it. The SEC vigorously pursued this restriction, severely limiting SG's participation in the proceedings and essentially delaying its own lawsuit. At the SEC's request SG conducted an extensive due diligence to verify that any funds it would use to retain legal counsel were not within the scope of the restraining order. SG was successful in establishing that the funds it would use to retain counsel were not within the scope of the asset freeze. SG was then able to retain counsel, who entered an appearance in September, 2000.

Thereafter, SG promptly moved to dismiss the SEC's complaint for lack of subject matter jurisdiction, arguing that SG was not offering or selling securities but was simply a game. The District Court (Tauro, J.), granted the Motion to Dismiss. The District Court recognized that:

> [a]lthough SG clearly intended to persuade website visitors to part with their money, the 'virtual shares' do not represent any of the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,' covered by federal securities laws. (<u>Securities and Exchange Commission v. SG, Ltd. et. al.</u>, 142 F. Supp. 126, 129 (D. Mass 2001)

The court went on to state that:

> SG labeled their website as a game from the outset.

---

[1] This amount is more than sufficient to compensate any alleged victims. In fact, at the hearing on the Motion to Dismiss the SEC represented that it had received complaints from only 250 people. (A copy of the transcript from the hearing from the Motion to Dismiss is attached as Exhibit B.)

2

> While it is true that participants in the 'virtual exchange' parted with their money in the hope of doubling it through SG's promotion of the website and payments by other participants, such activity does not make the 'virtual shares' securities. All transactions were in the context of a game. Although participants were looking for financial gain, no investment vehicle was involved. The scenario more closely resembled gambling than an investment insecurities. Id. at 130.

On appeal, the First Circuit Court of Appeals reversed. In its decision, the Court of Appeals recognized that the important factual question of whether participants were motivated primarily by a perceived investment opportunity or by the visceral excitement of playing a "game" would need to be answered in the District Court proceedings. Securities and Exchange Commission v. SG, Ltd. et.al., 265 F.3d 42, 49 (1st Cir. 2001). The Court of Appeals also recognized the existence of a significant legal issue that will need to be resolved by this Court, specifically that "SG may well have colorable arguments anent materiality and reliance (i.e., that, based upon its explicit disclosures, [of a ponzi or pyramid scheme] no reasonable investor should have been deceived or misled". 265 F.3d at 53. The case is now pending before this Court, and discovery is scheduled to commence.

### III.    ARGUMENT

**A.    UNFREEZING FUNDS TO ALLOW DEFENDANTS TO PAY ATTORNEY'S FEES AND RELATED EXPENSES IS NECESSARY AND APPROPRIATE.**

District Courts have held that it is appropriate to modify asset freeze orders to permit the payment of legal fees and related expenses. See Securities & Exchange Comm'n v. Pinez, 989 F.Supp. 325, 337 n. 12 (D.Mass.1997) (the District Court, through Judge Saris, allowed for the unfreezing of certain funds for the defense of a civil action

3

and allowed defendant's proposed modification of asset freeze order for his criminal defense); See also Securities & Exchange Comm'n v. Duclaud Gonzalez de Castilla, 170 F.Supp.2d 427, 430 (S.D.N.Y. 2001) (granting motion to release certain frozen assets for the purpose of paying legal expenses); Securities & Exchange Comm'n v. Schiffer, 1998 WL 307375 (S.D.N.Y. 1998) (allowing the release of previously frozen funds necessary to pay attorneys' fees).

Although the purpose of freezing assets is to ensure the satisfaction of an eventual judgment, "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." Id. at 429-30 (quoting Securities & Exchange Comm'n v. Maor Nursing Centers, Inc., 458 F.2d 1082 (2nd Cir.1972). Here, the deleterious effect of the freeze on SG weighs against the considerations indicating the need for such relief (addressed supra, Part II). SG is now subject to a wide-ranging restraining order, while it is forced to defend itself in parallel civil and criminal proceedings, both apparently brought by the SEC. Defending a civil action that is directly related to the same issues as the criminal proceeding has the unfortunate effect of diluting SG's time and limited financial resources. Thus far, SG has incurred substantial expenses as a consequence of this action and is exhausting the financial resources it is currently using to pay for legal fees. See Id. at 430 (holding that under such circumstances it is appropriate to modify asset freeze).

This issue is especially relevant here given that the limits on SG's funds are the result of the SEC's wide-ranging restraining order which may have been obtained improperly. The SEC sought to restrain SG's funds in June 2000. Because some of those funds were deposited in accounts in an Estonian bank, the SEC had to satisfy certain

4

requirements of Estonian law. Namely, the SEC had to show to the Estonian bank that the restraining order would assist in an ongoing criminal investigation. (See letter from Mari Manniko and Urmas Arumae to Daniel I. Small dated November 13, 2001, Estonian letter at Exhibit A). To satisfy this requirement, the SEC apparently represented to the Estonian Government that there was an ongoing criminal investigation. (See Id.; Transcript of November 11, 2001, Status Conference at Exhibit B).

Since the SEC's representation to Estonia, SG has not seen or heard anything from the FBI, or any other agency concerning a criminal investigation. Because SG learned from a magazine article that there may be a pending criminal investigation, it requested that the SEC confirm the existence or non-existence of a criminal proceeding against it. (See letter from Daniel I. Small to Frank Huntington dated September 25, 2001 at Exhibit C.) In response, the SEC stated that it had "absolutely no information about whether any criminal investigation of [SG] is currently underway." (See letter dated September 25, 2001 from Frank Huntington to Daniel I. Small at Exhibit D). Only after being confronted with the letter from the Estonian Counsel, did the SEC reverse itself and admit in a Status Hearing that an "ongoing criminal investigation" exists and that the SEC has been in contact with the FBI about the investigation. (See Exhibit B at page 8). This disturbing scenario strongly suggests that the FBI opened a file on SG solely at the SEC's request in order to help the SEC satisfy Estonian law and restrain SG's funds. If this is what transpired, then the SEC's representation to the Estonian government was false, the "criminal proceeding" was a sham and the restraining order must be modified.

Clearly, if the status quo is allowed to stand, attorney's fees and related litigation expenses would pose a severe financial burden on SG. As a result, SG would be

prevented from employing proper legal means to address serious outstanding issues and to otherwise defend itself. For example, in its decision, the First Circuit Court of Appeals noted significant factual and legal issues that will need to be resolved. The Court of Appeals recognized that the question of whether participants were motivated primarily by a perceived investment opportunity or by the visceral excitement of playing a "game" would need to be answered. 265 F.3d 42, 49 (1st Cir.2001). The Court of Appeals also recognized that "SG may well have colorable arguments anent materiality and reliance (i.e., that, based upon its explicit disclosures, [of a ponzi or pyramid scheme] no reasonable investor should have been deceived or misled." 265 F.3d at 53. SG wishes to address these issues and others, but would be prevented from doing so effectively if the wide-ranging asset freeze is not modified.

Furthermore, modifying the freeze order is necessary to prevent further avoidable delay of this extensive litigation. This lawsuit has already been unnecessarily delayed for approximately three months as a result of the SEC's refusal to allow SG to use its own funds to pay for legal fees, thus preventing SG from retaining compensated counsel. The SEC vigorously pursued this objection, severely limiting SG's participation in the proceedings and thus delaying the lawsuit. The Freeze Order, if not modified, would result in additional delay because SG would be forced to go to extreme lengths to come up with the necessary financial resources in order to pay attorney's fees and related litigation expenses.

**B. THE CONSIDERATIONS INDICATING THE NEED FOR THE ASSET FREEZE DO NOT APPLY IN THE PRESENT CASE**

The Commission presents two shaky grounds on which the Asset Freeze Order is warranted: first, the Commission inaccurately presents that the freeze is "necessary and

6

appropriate" to prevent SG from concealing its assets in "off shore" accounts. (See SEC Memorandum in Support of its *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Other Equitable Relief, and, on Notice, a Preliminary Injunction, page 18 at Exhibit E). Second, the Commission argues that the freeze is necessary and appropriate to "ensure that assets are available to satisfy an eventual judgment." Id.

### 1. **Off Shore Accounts**

The accounts in which SG maintained its funds and accounts that were in fact frozen, were legitimate bank accounts in legitimate banks. The fact that SG's accounts were located in foreign countries is of no consequence - SG is after all a foreign corporation organized under the International Companies Act of the Commonwealth of Dominica, with no ties to the United States, other than the fact that the United States is among some 70 countries of players, and thus SG kept one operating account in a U.S. bank. As such, there would be no reason for SG to maintain a bank account in the United States. If SG wanted to conceal its assets, it would not have placed them in accounts that could easily be located by the SEC and restrained by a court order. Accordingly, there is no evidence, and no threat that SG may conceal or transfer the funds beyond the court's jurisdiction.

### 2. **Satisfying an Eventual Judgment**

A court has the authority to freeze assets at an amount that will satisfy judgment should securities law violation be proven at trial. See Schiffer, 1998 WL 307375 (S.D.N.Y. 1998); see also Duclaud, 170 F.Supp.2d at 429 (S.D.N.Y. 2001) (noting that the primary purpose of freezing assets is to facilitate compensation of defrauded investors

7

in the event that securities law violation is established at trial). In the present case, $6.5 million in SG's assets are frozen in several banks. Only $2.6 million of SG's funds came from U.S. investors. (See Complaint, page 6, at Exhibit F). The SEC has made conflicting representations about the number of complaints it has received, but it is uncontested that it is a miniscule percentage of the over 300,000 players of the game worldwide. In its complaint, the SEC stated that it had received 70 complaints. (See Exhibit F at page 2). At the oral argument on the Motion to Dismiss, the SEC changed its story and claimed that it had received 250 complaints. (See Transcript of hearing on Motion to Dismiss at page 15, attached as Exhibit G). However this number is, at best, highly suspect, because the SEC subsequently broke its clear and unequivocal promise to the Court that, SG "is certainly entitled to look at the customer complaints or investor complaints" in its file. (See Exhibit F at page 15). Accordingly, the $6.5 million in frozen funds are more than sufficient to compensate any alleged complainant in the U.S. Considering that the primary purpose of the asset freeze is satisfied weighs heavily in favor of granting SG's Motion to Modify Asset Freeze Order.

## IV.   CONCLUSION

Based upon the foregoing, the Freeze Order should be modified to allow SG to use $250,000.00 of their assets to pay for attorney's fees and related expenses.

SG Limited, SG Perfect Limited and SG Trading Limited,
By their Attorneys

_____
Daniel I. Small (BBO # 467160)
Meaghan E. Barrett (BBO # 554295)
Butters Brazilian & Small
One Exeter Plaza
Boston, Massachusetts 02116
617-367-2600

Dated: December 21, 2001

## CERTIFICATE OF SERVICE

I, Daniel I. Small, do hereby certify that I served a true copy of Defendants' Memorandum of Law in Support of its Motion to Modify Asset Freeze Order upon the following party by first class mail, postage prepaid, this 21st day of December, 2001:

Frank C. Huntington, Esq.
Senior Trial Counsel
Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, Massachusetts 02108

_____
**Daniel I. Small**

9